Charles G. WRIGHT, Jr.

v.

Robert ROBERTS and the Disciplinary Board of the Supreme Court of Tennessee.

Supreme Court of Tennessee.

Nov. 20, 1978.

Charles G. Wright, Jr., Chattanooga, for appellant.

Lance B. Bracy, Nashville, for appellees.

## OPINION

FONES, Justice.

Appellant, Charles G. Wright, Jr., a member of the Chattanooga bar, was charged with unprofessional conduct committed while representing the wife in a divorce action in the Circuit Court of Hamilton County, Tennessee, and during his representation of a party seeking appointment as conservator of her father in the Chancery Court.

In the divorce action he was charged, (1) with advising his client to violate a restraining order; (2) surreptitiously taking a default judgment and final decree of divorce without notice to opposing counsel who had appeared in the case and without notice to the judge who awarded the decree that the husband had a divorce action pending in another division of the court that had been filed prior to the wife's action; and (3) filing a contempt citation against another lawyer and failing to present any evidence in support thereof.

In the conservatorship proceeding, appellant was charged with (1) failing to appear for scheduled motions; (2) failing to respond to the orders of the chancellor; (3) failing to divulge to one chancellor prior proceedings before another chancellor; and (4) failing to divulge the dismissed status of the conservatorship.

A hearing committee consisting of Frank N. Bratton, J. D. Culvahouse, and Robert Kirk Walker, found that appellant was guilty of unprofessional conduct in violation of T.C.A. § 29–308(5), disciplinary rule 1–102(4), (5), and (6) and disciplinary rule 7–102(A)(7) and (8) and suspended him from the practice of law for a period of six months. Appellant petitioned to chancery court for a review of the judgment of the hearing committee and Chancellor Len Broughton, sitting by special designation, affirmed their action in suspending appellant for six months.

Appellant has brought a direct appeal to this Court from the action of the chancellor and the case has been orally argued.

I.

Appellant represented the wife, Kathline Ann Wallace and Robert H. Crawford, an attorney at the Chattanooga Bar, represented the husband, Ronald Neal Wallace. The husband's complaint for divorce was filed on January 27, 1976, at 11:44 a. m., and assigned docket number N–35381. Judge Walker, Judge of Division IV of the Circuit Court of Hamilton County had signed a restraining order at 11:35 a. m. restraining the wife from removing the minor child of the parties from the State of Tennessee.

At 1:26 p. m., on January 27, 1976, appellant filed, on behalf of the wife, a complaint for divorce which was assigned docket number N–35387. Appellant obtained a restraining order from Judge Summitt, Judge of Division I at 1:28 p. m. on that date restraining the defendant from coming about the plaintiff or her residence or threatening her or the child or interfering with the custody of the child in plaintiff, wife.

Appellant testified that he received a call later in the afternoon of January 27, advising him of the filing of the husband's suit and asking if he would accept service of process. He responded that he would do so if Mr. Crawford would accept service of process in the suit he had filed on behalf of the wife. Later that same day appellant accepted service of process for his client and Mr. Crawford accepted service of process for his client.

During the thirty day period immediately following the filing of these suits, appellant and Mr. Crawford had a number of communications involving the restraining orders, the appropriate amount of temporary child support and the father's visitation privileges with the minor child.

They worked out an agreement for $20 per week temporary child support which was paid to appellant for his client. Husband learned that the wife had taken their ten month old child from the state. Mr. Crawford called appellant and confronted him with the fact that the restraining order had been violated. Appellant insisted and continues to insist that he did not read the restraining order when the bill was served upon him or at anytime prior to Mr. Crawford's call. Appellant advised Mr. Crawford that the wife was in Atlanta but that satisfactory visitation privileges would be worked out.

On Thursday, February 26, 1976, the thirtieth day following the filing of the suits, appellant and Mr. Crawford worked out an arrangement for the wife to bring the child to Chattanooga for visitation with the father. On that same day, appellant filed an answer in the husband's lawsuit and took a default judgment against the husband in the wife's lawsuit, without notice to opposing counsel. Appellant testified that he called his client in Atlanta at about 2:00 p. m. on Thursday, February 26, 1976, and advised her that if no answer was filed by the time the courthouse closed at 4:00 p. m. he would take a default judgment and that unless she heard from him later she was to be present in Chattanooga on Friday for

the purpose of getting the divorce. Appellant testified that, in fact, wife's aunt drove her to Chattanooga on the 26th and when he saw her on the morning of the 27th he learned that she had not brought the child, and would not bring the child to Chattanooga for the visitation which had been arranged. Appellant called Mr. Crawford's office on Friday, February 27, 1976, and left word that the child would not be available in accordance with the agreement. On that same day appellant took his client and her witnesses to the courthouse where they learned that Judge Summitt, to whose division the wife's case had been assigned, was out of town. Arrangements were made for Judge Payne to hear the wife's case by interchange and a final decree of divorce was entered in Judge Payne's court. Judge Payne did not know that the husband had filed a divorce complaint against the wife and did not know that the husband was represented by Mr. Crawford. Appellant did not disclose those facts to Judge Payne.

Appellant had mailed a copy of his answer in husband's suit to Mr. Crawford which Mr. Crawford received on Saturday. Mr. Crawford prepared an answer for filing in the wife's suit on Friday, February 17, mailed a copy to appellant, but did not file it in the clerk's office that day.

On March 8, 1976, Judge Payne, the presiding Judge of Part II of the Circuit Court of Hamilton County heard the husband's motion and set aside the default judgment and the final decree of divorce and transferred the case to Division III for consolidation with the husband's case which had been assigned the lowest docket number. Later the same day Judge Milburn, Presiding Judge of Division III, held a hearing on Mr. Crawford's petition to hold appellant in contempt for his complicity in violating the restraining order against removing the child from the state and taking a default judgment and final decree of divorce without notice to Mr. Crawford and without advising Judge Payne that the husband had a lawsuit pending in Division III of the Circuit Court seeking a divorce from his wife on the grounds of cruel and inhuman treatment and permanent custody of the minor child, and that the husband was represented in the wife's suit by counsel.

Judge Milburn found appellant in contempt of court and imposed a fine of $50 and a ten day jail sentence, but suspended the jail sentence.

Appellant insisted that he was unaware of the local rule requiring consolidation of the two cases; that he entertained the good faith opinion that he was entitled to treat them as separate cases and in that posture Mr. Crawford had made no appearance in the wife's case, within the contemplation of T.R.C.P. 55.01 and therefore he was entitled to take the default judgment, without five days notice, and proceed to final decree.

■ It should be entirely unnecessary to cite any authority in support of the fact that Mr. Crawford had made an "appearance" in the wife's lawsuit. Appellant refers to his extensive research on the question of what constitutes appearance, but has apparently overlooked a basic Tennessee authoritative source, Gibson's *Suit's in Chancery*. Chapter LXVII of the fifth edition of that work is entitled "Solicitors: Their Rights, Duties and Liabilities" and § 1243 reads in part as follows:

§ 1243. *His Retainer and Appearance in a Cause.*—Retainer is the act of a client by which he engages an attorney or Solicitor to manage a suit for him in Court. This act may be written or verbal, direct or indirect, express or implied. When a Solicitor appears in a cause, his authority so to do is presumed. The mere fact of his appearance is always deemed enough evidence of his authority; and neither the opposite party nor the Court expects or requires any other, in all ordinary cases. This appearance may be (1) by signing, or having his name signed to, some pleading or other paper filed in the cause; or (2) by entering his name on the rule or trial docket as a Solicitor in the cause; or (3) by appearing before the Chancellor or Master in vacation, or before the Court, as such Solicitor.

Within both the letter and the spirit of that section, Mr. Crawford had "appeared"

in the wife's suit. The process had his name signed to it as having accepted service on behalf of the defendant, husband, in accord with the condition prescribed by appellant before accepting service for his client, the day both suits were filed.

In our view it is immaterial whether or not appellant had actual knowledge of the local rule that required the consolidation of the two Wallace divorce cases in the Division to which the husband's suit was assigned. That two divorce actions pending in the same circuit court of any judicial district in this state must be consolidated and must be treated by counsel as having been consolidated from their inception, is too elementary to belabor. Again, for the inexperienced practitioner as appellant describes himself, and in the absence of any local rule, 2 Gibson, *Suits in Chancery* § 800(8) (5th ed. 1956) provides the guidance necessary to determine whether or not such suits should be consolidated.

Factually appellant insists that (1) he never made any representation to Mr. Crawford that no default would be taken; (2) no permanent relief was negotiated between appellant and Mr. Crawford; (3) Mr. Crawford and appellant communicated for a very short time during the negotiations; and (4) appellant had no fraudulent intent *in taking a default judgment.* Appellant's brief quotes his own explanations extracted from various portions of the record in support of these contentions. Three excerpts therefrom follow:

> Might I say for the record, and I am being somewhat repetitious, and if I was in Your Honor's position, I would do the same thing as far as getting the merits of the case, but at no time during this whole thing did I ever plan to be deceitful, did I ever manifest any deceitful actions to Mr. Crawford, and to my knowledge have I violated no rule other than some unwritten courtesy. Now, if I have violated that, and as Your Honor knows, it's a fine line between what is the letter of the law and what is customary among attorneys. Now, you overstep that a little bit and you are accused of being a sharp dealer,

> but my conscience is clear, and I did what I thought was right.

> I had in mind defending my client's case and I knew that I had to do it on the 26th. I knew that was the last day, and I knew I had to defend the case. Well, I did that. I had no way of knowing before that day was out that there would be any issue as to a default, and so I had a matter out at the Social Security Administration and wasn't even aware for the rest of that afternoon whether there was a default, but I thought—any my purpose was to represent my client, and there was no purpose of any fraud on my part, that there never has been. I carefully weighed what I though was the law and I intended to act within it. I never at any point had any intention of fraud, nor did I think any representations or manifestations of fraud, and that is my position.

> If I had thought that I had defrauded you in any way, I would have not wasted my client's time to come up here. I would not have wasted my time to go through this thing if I had thought that I had done anything to defraud you, and that was the only basis upon which it would be worth doing. I am not naive enought to think you are going to go along and never find out about it. I thought that I had taken a valid default, and I don't know if that answers your question, but you have got to realize that I took a default on behalf of my client representing her the best way I knew possible.

Taking as true and giving full faith and credit to everything appellant says in his defense, the fact remains that his action in taking the default judgment and final decree in the circumstances of the Wallace cases was a gross disregard of professional responsibility owed to the court and opposing counsel and a serious act of unprofessional and unethical conduct that demands suspension. Lawyers are charged with the duty to exercise the utmost good faith in their dealings with the courts, and opposing counsel as well as their clients. Appellant's act not only violated the ex-

press provisions of T.R.C.P. 55.01, but the most elementary principles of everyday, ordinary fundamental fairness—a level of conduct expected of all men. Lawyers are charged with a higher degree of appreciation of what is just and fair and are expected to adhere to that higher standard. Restraining orders of the courts of this state must be obeyed and it is intolerable for a lawyer to participate affirmatively in their violation. Any doubts about their scope or effect should be taken up with the court issuing them immediately and prior to any action that could possibly be construed as being in contravention thereof.

Appellant directs our attention to the lawyer's duty to represent his client zealously within the bounds of the law, as justifying his action. In his brief he cites the Code of Professional Responsibility, Canon 7, EC 7–2 wherein this sentence appears: "The bounds of the law in a given case are often difficult to ascertain." Appellant says, in substance, that in this case he was determined to represent his client as zealously as possible and while his actions may have been marginal he was justified in resolving the doubt in favor of the advantage to his client. We are cited to a single sentence in EC 7–3 to that effect: "While serving as advocate, a lawyer should resolve in favor to his client doubts as to the bounds of the law."

Neither EC 7–2 or EC 7–3 are concerned with the type of ethical conduct involved in this case. Those sections deal with questions involved in the advocacy of principles of law to wit: the line between urging frivolous interpretations of statutes, constitutional law and judicial opinions versus responsible, though perhaps unique interpretations.

Again guidance may be found in Gibson, *Suits in Chancery*, for those who are in doubt about the limits to which a lawyer may go in zealous fidelity to his client's cause. 2 Gibson, *Suits in Chancery* § 1252 (5th ed. 1956) reads in part as follows:

1. *Fidelity to Clients, and Its Limits.* To your clients be true; but do not allow your fidelity to them to tempt you to be false to yourself. Fidelity to a client in Chancery goes no further than what is lawful and proper to do and say in enforcement or protection of his legal or equitable rights. A Solicitor is under no legal or moral obligation to assert an illegal or inequitable claim, or to set up an illegal or inequitable defence [sic], or to take an unconscientious advantage of an adversary, in order to promote his client's welfare. The law is an honorable profession, intended for the promotion of justice, and not a trade of trickery, for the purposes of fraud or oppression.

Appellant does not deny that he counseled with and advised his client that she could take the minor child of the parties to Atlanta, Georgia, in violation of the restraining order issued in the husband's case. He insists he did nothing wrong because he did not read the restraining order prior to advising his client she could go to Atlanta, although the complaint with restraining order and summons had been served upon him, prior to giving that advice. He explained his position to the hearing committee as follows:

And after this happened, when, as I say, I received the divorce papers, they were served on me and at that time I hurriedly looked at the divorce complaint, not seeing any particular reason to read it in detail since I was familiar with the case and knew the issues, I looked at the prayers for relief and just concluded from that, among other things, that a mandatory injunction had been asked for on the part of the defendant or rather the husband, let's put it that way, the plaintiff in that action. That a mandatory restraining order had been asked for granting the child's custody to him pending the outcome of the case. Well, I knew that my restraining order on my action had granted the custody to my client. In other words, we had one restraining order, the restraining order that I had obtained, and I don't remember exactly who issued it, granted custody to my client and that the defendant in my action, or the husband, was not to interfere with that custody

nor was the husband to come near by client or her child or interfere with her or harm her in any way. And upon reading the prayer for relief concerning the mandatory restraining order, I said to myself, "Well, we've got a conflict here. I mean one judge has done one thing and one judge has done another thing."

So realizing that the status quo was that my client had the child and that I hadn't heard anything to the contrary, I just dismissed it from my mind saying, "Well, we've got the child and if they want to kick about this conflict in the restraining order, of course, that's up to them to do." But I saw the conflict and I just forgot about it in the sense that it was just one of these things."

■ Appellant is charged with knowledge of the restraining order. Whether he actually read it or not is immaterial insofar as determining whether or not he was guilty of unprofessional conduct. His failure to read the restraining order, if that be the case, amounts to an incomprehensible act of irresponsibility on his part in carrying out his duties to the court and to his client and warrants the same treatment and punishment as if he read the restraining order and deliberately counseled his client to disregard it.

## II.

On February 11, 1975, appellant filed a complaint in the Chancery Court of Hamilton County, Tennessee, seeking the appointment of Carrie W. Lazenby as conservator of the estate of her father, Curley Dixon. Charles DuPree was appointed guardian ad litem and he filed a formal answer on February 26, 1975. At a hearing on February 28, 1975, it appeared that Mr. Dixon was in a nursing home and that his social security checks were being paid directly to the home; that his only asset was a small home that was in a bad state of repair and was said to be valued in the range of $2,500 to $3,000. Apparently, on behalf of the conservator, the proposal at that hearing was that the house be repaired and rented to an unemployed son of Curley Dixon and that

he pay some undetermined rent at such time as he might obtain employment. At the conclusion of the February 28 hearing the court declined to appoint a conservator and directed appellant to investigate the possibility of the sale of the property or to provide the court with a plausible proposal with respect to repairing the home for rental to a reliable tenant.

No order was entered following the hearing on February 28, 1975, but according to Chancellor Thrasher's findings contained in an order entered on May 12, 1976, these events transpired subsequent to that hearing:

"After many weeks, the court requested Mr. Wright and the guardian ad litem to make a report concerning these and other related matters involved in this litigation. Mr. Wright did not honor the court's request even though the guardian ad litem was present. At this point in time, the court re-set the hearing and at the supplemental hearing, no proposals were submitted in addition to the original proposal which was inadequate."

On September 5, 1975, Mr. DuPree, the guardian ad litem, filed a motion to dismiss and to award attorney's fees. That motion recited that at the first hearing of the cause petitioner failed to present sufficient need for relief and a workable arrangement by which a conservator might be appointed; that the cause was then continued to April 16, 1975, at which time further hearings were had and petitioner again failed to prove benefit to the ward by the appointment of a conservator and again failed to present a workable plan; that since that date no additional action had been taken and that it appeared to the guardian ad litem that the petition should be dismissed. That motion contains a certificate of service upon opposing counsel, the appellant herein. The record reflects that the February and April hearings were before Chancellor Wilkes Thrasher, Chancellor of Part I of the Chancery Court of Hamilton County, Tennessee. The motion filed on September 5, 1975, bears the stamp of Part II of the Chancery Court of Hamilton County and

the record reflects that following the normal practice the clerk had assigned the case to Part II of the Chancery Court sometime in the interval between April and September. The guardian ad litem's motion came on for hearing on September 15, was passed two weeks and on September 29 was passed for an additional week. The reasons for deferring the motion do not appear in the record. On October 24, 1975, Chancellor Franks entered an order requiring petitioner Lazenby to take "procedural steps" before November 21, 1975, or the cause would stand dismissed on that date.

On February 16, 1976, the guardian ad litem filed a motion to dismiss the cause and award him an attorney's fee. The record does not reflect what action, if any, was taken on that motion which obviously did not recognize the effect of the order of October 24, 1975. On March 19, 1976, appellant filed a motion "to complete appointment of conservator and for order of sale." A hearing was held on March 29, 1976, before Chancellor Franks that resulted in the appointment of Carrie Lazenby as conservator in the estate of Curley Dixon.

On March 12, 1976, Chancellor Wilkes Thrasher entered an order reprimanding appellant. The order recites the history of the proceedings in the Dixon case, substantially as set out herein, and also recites that the Chancellor directed his court officer to bring Mr. Wright before the court on Monday, March 10 to explain his failure to appear in court on a motion involving the setting of a case in which he was counsel of record (a case other than the Dixon conservatorship). The order of reprimand says that Mr. Wright's response was that he had forgotten about it and that when asked about his absence at previous motion dockets and court hearings (presumably involving the Dixon case) "the court received a similar response." After initially holding Mr. Wright in contempt, the court modified its judgment and entered a written reprimand.

With reference to the Curley Dixon proceedings the order of reprimand also contains the following paragraph:

"The court is of the opinion that Mr. Wright did not advise the Chancellor that the case had heretofore been dismissed or that this court had refused to make said appointment until certain conditions precedent were met."

The Disciplinary Board found that appellant was guilty of unprofessional conduct in failing to respond to the orders of Chancellor Thrasher; in failing to move the Court to restore the action to the docket after it had been dismissed and in failing to divulge to Chancellor Franks the fact that Chancellor Thrasher had denied the appointment of a conservator on two prior occasions. However, the Disciplinary Board also correctly noted that no proof was adduced that any loss or prejudice resulted to the estate by the failure of petitioner to prosecute the conservatorship proceedings with diligence.

Appellant insists that he made an attempt to recite the history of the conservatorship proceedings but was interrupted after a brief recitation by an admonition of Chancellor Franks that impelled him to abandon it and proceed with his presentation of the substance of the motion.

Chancellor Franks' deposition was taken more than a year after the hearing, and he candidly acknowledged that "there may have been some mention of it but I don't specifically recall anything."

Appellant admits that he did not tell Chancellor Franks on March 16, that the Dixon conservatorship suit had been dismissed on November 21, 1975. He says that he called a clerk prior to November 21, 1975, and she told him she would "pull the file and put it in the active files so that it would not be dismissed." Further, appellant says he had had no prior experience with "automatic" dismissals and simply did not appreciate the import of the language that the case would stand dismissed "without further orders of the court."

Appellant's conduct in the Dixon case reflects a lack of understanding of, and compliance with, a lawyer's responsibilities as an officer of the courts, and a lack of diligence in representing his client's interests.

**476**

It was clearly unprofessional, although clearly less serious than his unethical conduct in the Wallace cases, where his affirmative acts bring directly into question his moral fitness to practice law.

### III.

■ We have read this entire record with great care and perhaps the most disturbing feature of this case is that appellant has convinced us that he believed he was doing the "right" thing when he took the default judgment and divorce decree in the Wallace case and that he continues to entertain that view today.

We have not discussed herein the facts and contentions of the parties with respect to appellant's petition in the Wallace cases to hold Mr. Crawford in contempt. Suffice it to say that we are of the opinion that the punishment imposed by the hearing committee and the chancellor is justified by appellant's unethical and unprofessional conduct in advising his client to violate the restraining order and the default judgment and final decree episode in the Wallace cases, standing alone.

We think the Chancellor's recommendation with respect to reinstatement was premature and inappropriate. When appellant's petition for reinstatement comes before a hearing committee its decision should be made on the basis of whether the evidence presented at that time satisfies the criteria for reinstatement prescribed in Rule 42, Section 19.3.

Otherwise, the judgment of the Chancery Court of Hamilton County is affirmed.

Disciplinary counsel and appellant are directed to agree on the date of the entry of an order pursuant to Section 18.3 of Rule 42, not more than fifteen days after the date this opinion is released, and also to comply with all other provisions of Section 18.

Costs are adjudged against appellant.

HENRY, C. J., and COOPER, BROCK and HARBISON, JJ., concur.